**[J-51A-2024, J-51B-2024, J-51C-2024, J-51D-2024, J-51E-2024, J-51F-2024, J-51G-2024, J-51H-2024, J-51I-2024 and J-51J-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.D.A., III, A MINOR | : | No. 15 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court at No. 683 MDA |
| APPEAL OF: E.D.A., JR., FATHER | : | 2022 dated December 14, 2023, |
| | : | Affirming the Decree of the York |
| | : | County Court of Common Pleas, |
| | : | Orphans' Court, at No. 2022-0008a |
| | : | dated April 20, 2022 |
| | : | |
| | : | ARGUED:  November 20, 2024 |

| | | |
|---|---|---|
| IN THE INTEREST OF: B.W., A MINOR | : | No. 16 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court at No. 687 MDA |
| APPEAL OF: E.A., JR., FATHER | : | 2022 dated December 14, 2023, |
| | : | Affirming the Decree of the York |
| | : | County Court of Common Pleas, |
| | : | Orphans Court, at No. 2022-0007a |
| | : | dated April 20, 2022 |
| | : | |
| | : | ARGUED:  November 20, 2024 |

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B.A., A MINOR | : | No. 17 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court at No. 686 MDA |
| APPEAL OF: E.A., JR., FATHER | : | 2022 dated December 14, 2023, |
| | : | Affirming the Decree of the York |
| | : | County Court of Common Pleas, |
| | : | Orphans' Court, at No. 2022-0019a |
| | : | dated April 20, 2022 |
| | : | |
| | : | ARGUED:  November 20, 2024 |

| | | |
|---|---|---|
| IN THE INTEREST OF: R.M.A., A MINOR | : | No. 18 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: E.A., JR., FATHER | : | Superior Court at No. 685 MDA |

|  |  |  |
|---|---|---|
|  | : | 2022 dated December 14, 2023, |
|  | : | Affirming the Decree of the York |
|  | : | County Court of Common Pleas, |
|  | : | Orphans' Court, at No. 2022-0010a |
|  | : | dated April 20, 2022 |
|  | : |  |
|  | : | ARGUED:  November 20, 2024 |
| IN THE INTEREST OF: E.J.A., A MINOR | : | No. 19 MAP 2024 |
|  | : |  |
|  | : | Appeal from the Order of the |
| APPEAL OF: E.A., JR., FATHER | : | Superior Court at No. 684 MDA |
|  | : | 2022 dated December 14, 2023, |
|  | : | Affirming the Decree of the York |
|  | : | County Court of Common Pleas, |
|  | : | Orphans' Court, at No. 2022-0009a, |
|  | : | dated April 20, 2022 |
|  | : |  |
|  | : | ARGUED:  November 20, 2024 |
| IN THE INTEREST OF: E.D.A., III, A MINOR | : | No. 20 MAP 2024 |
|  | : |  |
|  | : | Appeal from the Order of the |
|  | : | Superior Court at No. 755 MDA |
| APPEAL OF: T.M.A., MOTHER | : | 2022 dated December 14, 2023, |
|  | : | Affirming the Decree of the York |
|  | : | County Court of Common Pleas, |
|  | : | Orphans' Court, at No. 2022-0008a |
|  | : | dated April 20, 2022 |
|  | : |  |
|  | : | ARGUED:  November 20, 2024 |
| IN THE INTEREST OF: E.J.A., A MINOR | : | No. 21 MAP 2024 |
|  | : |  |
|  | : | Appeal from the Order of the |
| APPEAL OF: T.M.A., MOTHER | : | Superior Court at No. 756 MDA |
|  | : | 2022 dated December 14, 2023, |
|  | : | Affirming the Decree of the York |
|  | : | County Court of Common Pleas, |
|  | : | Orphans' Court, at No. 2022-0009a |
|  | : | dated April 20, 2022 |
|  | : |  |
|  | : | ARGUED:  November 20, 2024 |
| IN THE INTEREST OF: R.M.A., A MINOR | : | No. 22 MAP 2024 |
|  | : |  |

[J-51A-2024, J-51B-2024, J-51C-2024, J-51D-2024, J-51E-2024, J-51F-2024, J-51G-2024, J-51H-2024, J-51I-2024 and J-51J-2024] - 2

| | | |
|---|---|---|
| APPEAL OF: T.W.A., MOTHER | : | Appeal from the Order of the Superior Court at No. 757 MDA 2022 dated December 14, 2023, Affirming the Decree of the York County Court of Common Pleas, Orphans' Court, at No. 2022-0010a dated April 20, 2022 |
| | : | |
| | : | ARGUED: November 20, 2024 |
| IN THE INTEREST OF: A.B.A., A MINOR | : | No. 23 MAP 2024 |
| | : | |
| APPEAL OF: T.W.A., MOTHER | : | Appeal from the Order of the Superior Court at No. 758 MDA 2022 dated December 14, 2023, Affirming the Decree of the York County Court of Common Pleas, Orphans' Court, at No. 2022-0019a dated April 20, 2022 |
| | : | |
| | : | ARGUED: November 20, 2024 |
| IN THE INTEREST OF: B.W., A MINOR | : | No. 24 MAP 2024 |
| | : | |
| APPEAL OF: T.W.A., MOTHER | : | Appeal from the Order of the Superior Court at No. 759 MDA 2022 dated December 14, 2023, Affirming the Decree of the York County Court of Common Pleas, Orphans' Court, at No. 2022-0007a dated April 20, 2022 |
| | : | |
| | : | ARGUED: November 20, 2024 |

## DISSENTING STATEMENT

**JUSTICE DONOHUE**                                    **FILED: March 26, 2025**

We granted allowance of appeal to address the following issue:

> Does clear and convincing evidence exist to support a termination of parental rights decision where the trial court based its decision upon the testimony of one witness without acknowledging the competent testimony of multiple witnesses

[J-51A-2024, J-51B-2024, J-51C-2024, J-51D-2024, J-51E-2024, J-51F-2024, J-51G-2024, J-51H-2024, J-51I-2024 and J-51J-2024] - 3

who provided testimony that directly contradicted that witness' testimony.

*In the Interest of: E.D.A., et. al.,* 23-27 MAL 2024 (per curiam). By dismissing this case as improvidently granted, the Majority blesses the trial court's determination to terminate the appellants' (Parents') rights to their five children. Yet, the trial court failed to support its determination with clear and convincing evidence, thereby erring as a matter of law. This error is apparent from the face of the trial court's opinions and the record and I cannot join my colleagues in dismissing this case as improvidently granted.

This matter involves the severance of Parents' constitutionally protected, fundamental right to make decisions pertaining to the care, custody, and control of their children. *Hiller v. Fausey*, 904 A.2d 875, 885 (Pa. 2006). That consequence, the permanent destruction of the fundamental relationship between parent and child, is so drastic that it has been coined "the civil equivalent to the death penalty." *See In re Adoption of C.M.*, 255 A.3d 343, 362 (Pa. 2021).

This fundamental right "does not evaporate simply because [parents] have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 754 (1982). The United States Supreme Court has, in fact, recognized that "persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Id.* at 753-54. One critical aspect of these procedures is the fair application of the correct standard of proof. The United States Supreme Court has explained that the purpose of a standard of proof "is to 'instruct the fact[]finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Id.* at 754-55 (quoting *Addington v. Texas*, 441 U.S. 418 (1979) (quoting *In re Winship*, 397 U.S. 358

(1970) (Harlan, J., concurring)). If the government seeks to terminate parental rights, due process requires that the state produce at least clear and convincing evidence, which is the highest standard of civil proof, to support its allegations. *Id.* A lower standard is not constitutionally sufficient. *Id.* Imposing this high burden of proof is "one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate terminations will be ordered." *Id.* at 764-65 (quoting *Addington*, 441 U.S. at 427); *see also In re T.R.*, 465 A.2d 624 (Pa. 1983) (adopting the clear and convincing standard of proof following *Santosky*).

Against this backdrop, I turn to Pennsylvania's Adoption Act. Pennsylvania law commands the state agency seeking to terminate parental rights, here, the York County Office of Children, Youth and Families ("CYF"), to produce clear and convincing evidence that the statutory grounds for termination exist under 23 Pa.C.S. § 2511(a). Only if the court concludes that the parents' conduct warrants termination under Section 2511(a) does the Court engage in the second part of the termination analysis under Section 2511(b), which entails consideration of the impact termination of parental rights will have on the child's well-being, namely, the "developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b); *see also In re Adoption of C.M.*, 255 A.3d at 359.

Intrinsic in the clear and convincing evidence standard of proof is that the facts upon which a court's decision is made must be supported by competent, specific evidence of record. Accordingly, we only defer to trial judges if "the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion." *In re Adoption of C.M.*, 255 A.3d at 362 (quoting *In re Adoption of S.P.,* 47 A.3d 817, 826-27 (Pa. 2012)). As an appellate court, we are obligated to review the record to ensure that it supports factual findings. *See id.*; *see also Interest of S.K.L.R.*,

256 A.3d 1108, 1121 (Pa. 2021); *see also Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998) (citing *Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994) (providing that "[i]n cases of involuntary termination of parental rights, an appellate court reviews whether competent evidence supports the trial court's decree")). "Specificity and corroboration are crucial to the foundation of competent evidence." *In re Adoption of C.M.*, 255 A.3d at 369. "Credibility is not a substitute for competency." *Id.* at 370. In other words, an unsupported opinion does not constitute competent evidence. *Id.* at 369-70.

The Majority, in deciding to dismiss this case, tacitly endorses the lower courts' opinions and gives the impression that clear and convincing evidence can be based solely on a credibility finding because that is the only basis for the trial court's conclusion. The stakes in this case are high. The parties have fully briefed and argued the issue with the expectation that we would render an opinion on this important area of the law. We can and should take this opportunity to confirm the importance of the clear and convincing evidence standard and the discrete role that a trial court's credibility finding plays in determining whether the standard is met. While an appellate court may not substitute its own credibility determinations for those of the trial court, it is incumbent on the appellate court to confirm that testimony deemed credible is based upon evidence of record.

In the instant case, CYF filed petitions to terminate[1] Parents' parental rights to their five minor children pursuant to Sections 2511(a)(1), (2) and (5). As to the four oldest children, CYF also sought termination pursuant to Section 2511(a)(8). When the trial court stated on the record after the termination hearings that it would be terminating parental rights, counsel asked the trial court to specify under which subsections of Section 2511(a) it was basing its termination decision. N.T., 4/18/2022, at 204. The trial court

---

[1] CYF filed the petitions on January 19, 2022.

answered, "I think you should address the sections that [CYF] put in the petitions." *Id.* at 205. In its opinion, the trial court cited Sections 2511(a)(1), (2), (5), (8), and (b), but it only discussed Sections 2511(a)(5), (8), and (b). Trial Court Opinion, 6/17/2022, at 4-5. Thus, the trial court premised its decision on Sections 2511(a)(5), (8) and (b), and the Superior Court only reviewed the termination decision pursuant to subsections (a)(5) and (b).

Section 2511(a)(5) provides for termination of parental rights if:

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5). Section 2511(a)(8) provides for termination of parental rights if:

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, [twelve] months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

As explained above, the evidentiary standard for the termination of parental rights is clear and convincing evidence, and it is indisputable that clear and convincing evidence is the most robust standard of civil proof. Although the lower courts paid lip service to the clear and convincing standard, the opinions do not demonstrate an understanding of the

heightened importance of that standard, especially in the context of terminating a fundamental right.

The nearly identical opinions provided by the trial court in Mother and Father's cases focus on Parents' financial status, environmental factors, and the troubled early history of the case rather than the more recent evidence presented at the termination hearings, which demonstrated the extensive progress made by Parents to remedy the conditions that led to the removal of their children.[2] *See Interest of S.K.L.R.*, 256 A.3d at 1127, 1129 (stating that trial courts "are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act"). To begin, environmental factors and indigency are never sufficient bases on their own for destroying familial bonds. *See* 23 Pa.C.S. § 2511(b) ("The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent."). On these factors, the trial court credited the testimony of one witness who testified at the termination hearings: the CYF Caseworker, to support its determination. Likewise, the Superior Court's decision revolved around the CYF Caseworker's testimony, which it found sufficient to support the termination decision. As I demonstrate, however, a review of the transcripts from the termination hearings reveals that the CYF Caseworker's conclusory beliefs lacked any support in the evidentiary record, and in fact were contradicted by specific competent testimony of multiple other witnesses. As such, the testimony central to the lower courts' determinations cannot support findings requiring clear and convincing evidence. Moreover, I reiterate that "[s]pecificity and **corroboration**

---

[2] I refer to only the Mother's opinion throughout and note distinctions where relevant.

are crucial to the foundation of competent evidence" and that "[c]redibility is not a substitute for competency." *In re Adoption of C.M.*, 255 A.3d at 369-70 (emphasis added).

First, I focus upon the trial court's conclusion that Parents failed to sufficiently progress in providing a suitable home environment. Professionals from Pressley Ridge, the entity Parents were ordered to work with, testified at a January 11, 2022 permanency review hearing and at the April 2022 termination hearings that Parents achieved stable, suitable housing and recommended closing out services. N.T., 1/11/2022, at 24-25; N.T, 4/18/2022, at 130, 133-34, 136. One of Parents' Pressley Ridge family advocates, who had weekly contact with the family, testified that her "sole goal" was to ensure that Parents' home was appropriate for visitation and reunification. N.T., 1/11/2022, at 24-25. According to the family advocate, the entire home was appropriate, and as of January 10, 2022, "everything that needed to be done was complete." *Id.* at 24, 30. Because the goal had been met, and the home was appropriate for the children to visit and reside in, she was recommending that her services end because "[t]he family no longer needs advocacy. There are no concerns or needs that the family would need to complete." *Id.* at 25, 27. Likewise, the Pressley Ridge family therapist testified that Parents' home was appropriate. N.T., 4/1/2022, at 115. Mother's drug recovery specialist similarly testified that she had been to Parents' home frequently and found their living conditions to be appropriate. *Id.* at 178.

Yet, the trial court relied extensively on testimony from hearings that predated the April 2022 termination proceedings for its conclusions regarding Parents' housing.[3]

---

[3] I proceed from the assumption that the trial court's recitation of the history of the case is accurate. No party has challenged this aspect of the trial court's opinion. To the extent the Majority is concerned with incomplete aspects of the record, this is not an impediment to our review because Pa.R.A.P. 1926(b)(1) allows the Court "upon application or on its own initiative at any time" to "direct that a supplemental record be certified and transmitted if necessary[.]" Pa.R.A.P. 1926(b)(1).

Specifically, it referred to evidence presented more than a year prior, at a February 10, 2021 permanency review hearing, which described dog feces on the floor of the home and the presence of bugs. Trial Court Opinion (Mother), 6/17/2022, at 11. The trial court also cited evidence from an August 5, 2021 permanency review hearing, which revealed that while Parents had purchased new furniture and rugs, the home still had bugs, clutter, and an odor. *Id.* at 16. The trial court acknowledged the testimony of Parents' family therapist from a January 11, 2022 permanency review hearing indicating that the home was appropriate, but it discounted the value of her testimony because she only inspected the living room. *Id.* at 19-20. As for evidence presented at the termination hearings, the trial court relied on the CYF Caseworker, whom it deemed credible, who claimed that the house was not suitable because of dog feces, space heaters, and the need for minor home repairs. N.T., 4/1/2022, at 200-01, 204.

Beside this testimony by its caseworker, CYF did not present evidence explaining how such housing concerns impacted Parents' ability to care for their children, and the trial court did not address this core issue. Moreover, several factors undermined the CYF Caseworker's complaints with respect to housing. Testimony presented at the termination hearings revealed that necessary repairs were in areas of the house not accessible to the children. *Id.* at 96. Further, the repairs the CYF Caseworker complained of were out of Parents' control to perform because they rented, and therefore were the responsibility of the landlord. Meanwhile, the CYF Caseworker admitted that all of the children had beds, that Parents had lived in the same rental since October 2020, and that they had never been evicted. *Id.* at 199-202; N.T., 4/18/2022, at 15-17. Accordingly, the trial court's findings regarding housing were based on evidence of isolated problems, some out of the control of Parents and others that did not impact the safety of the Children. The trial court did not recognize the contrary testimony presented at the termination

hearing by professionals with extensive exposure to the home who concluded that the home was suitable for the Children and that their Parents had met their goals. Even if the same weight is given to competing evidence, it cannot be said that the evidence of unsuitable housing is clear and convincing. *See In re Adoption of C.M.*, 255 A.3d at 362 (appellate courts are obligated to review the record and must defer to trial judges only if "the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion."); *see also Interest of S.K.L.R.* 256 A.3d at 1121.

The trial court premised its termination decision in large part on its belief that Parents were not sufficiently financially stable to be reunified with their children. This conclusion was based on more vague, nonspecific testimony from the CYF Caseworker. At the termination hearings, the CYF Caseworker testified that because Mother held different positions of employment over time, she did not believe "there's been stable employment." N.T., 4/1/2022, at 205. She also complained that Parents did not provide her with suitable documentation to verify their employment. *Id.* at 205-06.

There are several problems with relying on this testimony. The CYF Caseworker's testimony that Parents did not provide suitable documentation was at most equivocal. Initially, the CYF Caseworker admitted that Parents gave her pay stubs for their jobs at FedEx, and she agreed that she received documentation "at times." *Id.* at 206. Though she testified that they switched jobs, the mere fact of changing employment does not support a conclusion that Parents lacked steady income. To the contrary, Father testified at the termination hearings to the various jobs he held, and that although he switched jobs often, there were only a few days he had not worked in the preceding year. N.T., 4/18/2022, at 97. Mother's testimony revealed that while she switched jobs often, anytime she or Father "chose to leave a job, we made sure that there was another one starting

within a few days." *Id.* at 151. Mother would update the Pressley Ridge team on her employment status, and because CYF ordered her to work with Pressley Ridge, she believed that team updated CYF. *Id.* at 162. Mother testified that she was often forced to switch jobs because her shifts interfered with CYF's family plan goals, including her drug testing and treatment schedule. *Id.* at 148-49. Finally, Parents, through the professionals at Pressley Ridge, provided CYF with income verification. N.T., 1/11/2022, at 26-27. The CYF Caseworker further complained that Parents did not submit documentation of their expenses; however, CYF never requested that they submit their expenses. Had CYF asked for information regarding expenses, Parents could have provided it. *Id.* at 25-27. Thus, the CYF Caseworker opined that Parents failed to achieve financial stability in large part based upon criteria Parents were never asked to meet. Removing those improper considerations from the CYF Caseworker's rationale, her testimony as to Parents' failure to achieve financial stability boils down to her opinion that changing jobs equals job instability, even if changing jobs does not result in gaps in income.

Overall, in terms of financial stability, the competent testimony of multiple witnesses establishes that Parents were consistently employed, and the Pressley Ridge professionals recommended closing out services because Parents had achieved a level of financial stability needed for reunification. *Id.* at 25. The trial court based its decision on one CYF Caseworker's vague and unfounded complaints regarding Parents' financial status and environmental factors as they existed at the outset of the dependency action, entirely ignoring the documented performance attested to by the Pressley Ridge professionals.

I turn next to the trial court's findings of physical abuse as to the December 2020 allegations and "[t]he [P]arents' consistent denials that anything happened regarding the

finding of abuse" as a basis for its termination decision.[4] Trial Court Opinion (Mother), 6/17/2022, at 31. The record reveals the following. CYF received allegations of abuse in December 2020 in relation to incidents that occurred prior to Children being adjudicated dependent. CYF, however, did not investigate those allegations until the trial court forced it to in November 2021. On January 11, 2022, over a year after the initial reports of abuse came to light, CYF completed its investigation. N.T., 4/18/2022, at 63-64.[5] On March 10, 2022, the trial court made a belated finding of abuse in relation to the incidents.[6] Parents were never criminally charged. N.T., 4/1/2022, at 208. The record reveals that CYF prolonged the investigation in part because of Parents' reluctance to submit to interviews with police and CYF. *Id.* at 63-64 (indicating that CYF was waiting for police to conduct interviews before moving forward with its own investigation); *but see* N.T., 1/11/2022, at 18 (indicating that Parents did not respond to CYF's emails to schedule interviews because they were seeking criminal attorneys); *see also Interest of E.D.A.*, 2023 WL

---

[4] When questioned at the termination hearings, Parents agreed that it is not appropriate to strike children out of frustration. N.T., 4/18/2022, at 116-17; 176. Father testified that he "never beat [B.W.] with a belt, so – I don't do that. I will not do that." *Id.* at 126. When asked by counsel whether she would be able to stop someone, such as her spouse, from disciplining a child "with a weapon or acting physically towards a child out of frustration," Mother answered affirmatively. *Id.* at 176.

[5] After CYF provided a finding of "indicated" as to both Parents with respect to the allegations of physical abuse, the trial court changed the primary goal to adoption with a concurrent goal of reunification. N.T., 1/11/2022, at 49.

[6] In January 2022, CYF found Parents indicated as perpetrators of physical abuse against El.A. and B.W. N.T., 1/11/2022, at 7. A Child Advocacy Center ("CAC") forensic interviewer testified at the March 10, 2022 hearing that B.W. disclosed being hit with a belt. N.T., 3/10/2022, at 12-13. The CYF Caseworker testified at the March 10, 2022 hearing that B.W. disclosed that Parents "sometimes … slapped [El.A.], so there was blood under his tongue, and that [El.A] would cry a lot and neighbors would hear." *Id.* at 28-29.

8650259, at *2 (attributing the prolonged investigation to Parents' "refusal to submit to police interviews"). Of course, Parents had no obligation to submit to a police interview.

CYF's delayed investigation distorted the entire narrative and progression of this case.[7] Testimony presented at the termination hearings, which the trial court did not discuss, revealed that Parents made significant progress since the initial report of abuse and that there were no remaining concerns about physical abuse. Parents' family therapist met with Parents once a week to discuss parenting goals and to help them process anxiety and fears in relation to termination. N.T., 4/1/2022, at 87-88. The therapist testified that any incidents relating to the abuse were from "almost two years ago" and there had been "significant progress" since that time, *id.* at 120-21, and she recommended closing out all advocacy services. *Id.* at 115. Additionally, testimony presented at the termination hearings revealed that Parents were consistently receiving mental health treatment, and although they were discharged briefly from these services, it was due to an insurance mix-up. N.T., 4/18/2022, at 99-100, 113, 152-53, 169-70; Trial Court Opinion, 6/17/2022, at 14 (acknowledging that Mother "had successfully completed mental health service with PCHB"). The trial court's failure to address the concrete, uncontradicted evidence of Parents' progress and its myopic focus on the circumstances of the case as they existed when the case began is problematic, given that the law mandates CYF to produce clear and convincing evidence in support of termination. The trial court's finding, that the physical abuse issue had not "gotten any better for a year and a half, two years, depending on how you want to time it," was unsupported by the record

---

[7] Upon prompting by the trial judge, the CYF Caseworker indicated that the finding of physical abuse factored into CYF's position that Parents were not fit to be reunified with the children. N.T., 4/1/2022, at 234-35.

because the evidence at the termination hearings was to the contrary.[8]  No **evidence** corroborated the CYF Caseworker's **opinions** that Parents were not in a position to reunite with their Children given the lack of improvement regarding physical abuse, a crucial aspect of the clear and convincing evidence standard.[9]  Plainly, there was a complete lack of competent evidence to support the trial court's conclusion that there had been no progress in terms of physical abuse.  *See Matter of Adoption of Charles E.D.M., II*, 708 A.2d at 91 (recognizing that an appellate court reviewing a termination decision must consider whether competent evidence supports the trial court's decree and reversing a termination decision due to lack of competent record evidence).

A termination hearing is not a mere formality.  It is a requirement imposed by the General Assembly to protect the rights of all parties involved.  Decisions involving the possible termination of parental rights require the utmost attention and consideration, as reflected by the high burden of proof imposed on the party seeking termination.  "[S]uch a significant final decree warrants the courts' closest consideration of whether competent evidence clearly and convincingly proves the precise elements of the grounds at issue, in a manner 'so clear, direct, weighty and convincing' it betrays no hesitance regarding the truth of the facts in issue."  *In re C.M.*, 255 A.3d at 362.  Given the lack of competent

---

[8]  At the end of the April 18, 2022 termination hearing, the Guardian Ad Litem ("GAL") for the children opined that CYF had met its burden of proving grounds for termination.  N.T., 4/18/2022, at 191-94.  Though the GAL acknowledged "a lot of positives," he parroted the CYF Caseworker's opinions that the house was not consistently appropriate, that Parents switched jobs often, and the purported lack of documentation verifying employment.  *Id.* at 192.  The GAL stated that his "biggest concern" was that he had not "heard anything as to the abuse concerns being addressed."  *Id.*  The trial judge expressed his agreement, on the record, with the GAL's recommendation.  *Id.* at 203.  As discussed, "the abuse concerns" were specifically addressed by the therapist.

[9]  The CYF Caseworker could not testify consistently regarding her beliefs that Parents' had not progressed in terms of mental health treatment, likely because she lacked direct knowledge of it.  N.T., 4/1/2022, at 225, 226; 4/18/2022, at 72.

evidentiary support for the CYF Caseworker's opinion testimony and the trial court's almost exclusive reliance on her testimony in its decision,[10] I conclude that CYF has not met its burden of proving that clear and convincing grounds for termination exist.

Parents diligently worked to comply with the "laundry list of goals" CYF implemented, a list which "even the most competent and dedicated of parents would struggle to accomplish." *Interest of S.K.L.R.*, 256 A.3d at 1127. Not long before CYF filed the petitions to terminate parental rights, the trial court praised Parents, telling them that they had been cooperative and that this case was "headed in the right direction. I'm pleased. Please keep up the good work." N.T., 11/10/2021, at 64. Parents were actively

---

[10] The CYF Caseworker's bias was directly challenged by a CYF colleague and the trial court rejected the challenge and vouched for the CYF Caseworker on the record:

> I feel compelled to give some kind of a defense to [the CYF Caseworker] on your comments. People in the judicial system sometimes comment to coworkers, friends, spouses, et cetera, about the dire nature of their jobs and the cases out of sheer frustration. Judges have been known to do that with their staff, law clerks, for example, those are said in frustration are said in a confidential nature expecting that no one was going to be testifying about them in a court of law. And, sir, I just want you to know that [the CYF Caseworker's] job is a job that, well, you couldn't pay me enough money to do it, let's put it that way. She was frustrated. She's frustrated everyday she does her job because this – this is tough stuff. We're dealing with children here and should they be returned to parents[.] These are huge issues that are very stressful, and I am simply not going to let [the CYF Caseworker] leave this courtroom thinking that I think what she did was a terrible thing. They were words said in frustration. This is a frustrating job and a frustrating system, and I just want you to hear my defense of [the CYF Caseworker] before you leave.

N.T. 4/1/2022, at 136, 167-69. The trial court also stated that it was not listening to the witness testimony that questioned the CYF Caseworker's motives and handling of this case to the extent it was for the purpose of creating "any kind of victim mentality by these parents, or anything like that[.]" *Id.* at 167.

engaged in the permanency plan. They attended all supervised visits and never cancelled a visit. *Id.* at 50. In significant contrast, the CYF Caseworker observed only two such visits, total, over the life of the case. N.T., 4/18/2022, at 25-26. She observed a June 23, 2021 birthday party, which she described as chaotic, and one February 16, 2022 visit, which occurred after the filing of the termination petition. *Id.*[11]; N.T., 1/11/2022, at 15-16. Parents successfully completed drug treatment,[12] and they worked closely with their assigned Pressley Ridge team, who recommended closing out services. Like many Pennsylvanians, Parents struggled financially. However, they were always employed, maintained a stream of income and housing, and communicated transparently with the Pressley Ridge team.

In its brief, CYF observes that "[w]hen a trial court makes a 'close call' … the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court." CYF's Brief at 26 (quoting *Interest of S.K.L.R.*, 256 A.3d at 1124). CYF admits that "the lower court could have created a cleaner record" and that the trial court did a poor job of "reconciling discrepancies." *Id.* at 34. CYF suggests that the Court "remand for the trial court to clean things up without necessarily reversing the decision." *Id.*

---

[11] The Pressley Ridge professionals spent substantial time with Parents. *See* N.T., 4/1/2022, at 111 (estimating that the family therapist spent at least 107 hours with Parents); *see also* N.T., 4/1/2022, at 63, 68 (estimating that Pressley Ridge family advocate, who observed at least "a hundred visits," spent up to 400 hours observing the family).

[12] Mother's drug counselor testified that Mother was compliant with her drug treatment, that Mother continued attending weekly sessions even though she was not required to, and that Mother "of her own accord, has continued to do the advanced outpatient to support her recovery as well, which is weekly." N.T., 4/1/2022, at 31. The drug counselor had no concerns about Mother using drugs or alcohol. *Id.* at 35, 41, 44. Father had been discharged successfully from methadone treatment on November 8, 2021. N.T, 11/10/2021, at 28-29.

Only if one gives equal weight to the unsupported opinion testimony of the CYF caseworker and the other multiple witnesses who documented their impressions does this case become a close call. Even if the supported, competent evidence in a termination of parental rights case actually results in a "close call" and could go either way, in my view, the clear and convincing evidence standard, by definition, is not met because such nearly-equal evidence is not "**so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy of the truth of the precise facts in issue**." *Interest of N.B.-A.*, 224 A.3d at 668 (emphasis added). A "close call" inherently reflects hesitancy. Characterizing something as a close call admits that clear and convincing evidence is lacking and in those circumstances, the fundamental right to be a parent should not be terminated. Contrary to what CYF would have us conclude, *see* CYF's Brief at 26, the law does not prevent appellate courts from scrutinizing decisions for support in the record. Appellate courts must be careful not to mistakenly characterize a credibility determination as clear and convincing evidence where the testimony, found credible by the trial court, is not corroborated and supported by facts of record.

Here, the record reveals that the lower courts completely disregarded the undisputed evidence establishing Parents' substantial progress in favor of the unsupported perceptions of one caseworker, which were neither specific nor corroborated, and an improper fixation on the prior history of this case. "Trial courts are tasked with considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party met its burden by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act." *Interest of S.K.L.R.*, 256 A.3d at 1129. Accordingly, I would not dismiss this case as having been improvidently granted. Instead, I would remand the case to the

trial court to take into account the evidence supported by the record at the termination hearings.

Because I do not believe CYF established clear and convincing grounds for termination under Section 2511(a), in my view, Section 2511(b) would not come into play in this case. Nevertheless, CYF has failed to overcome its burden of producing clear and convincing evidence of termination under subsection (b) as well, and the trial court falls short in its analysis of this provision.

As with Section 2511(a), to satisfy its burden of proof, CYF must prove that termination is warranted under Section 2511(b) by clear and convincing evidence. *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Section 2511(b) requires the trial court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." *Id.* We confirmed in *Interest of K.T.* that the trial court, in assessing a termination petition, must "focus on the child and consider all three categories of needs and welfare." *Id.* We stressed that "the determination of the child's particular needs and welfare must be made on a case-by-case basis." *Id.* Courts must assess "**each** child's specific needs." *Id.* at 1106 (emphasis added).

*Interest of K.T.* further clarified that "analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, i.e., whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at 1113. The Section 2511(b) analysis "must include consideration of other important factors, such as the child's need for permanency and length of time in foster care[.]" *Id.* The trial court possesses discretion in weighing each factor under Section 2511(b). *Id.* "To determine whether the petitioning party has met this burden, the court must conduct a full subsection (b) analysis focused on the child. The court must not truncate its analysis and preclude

severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child. Therefore, to grant termination when a **parental** bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.* at 1114 (emphasis in original).

The trial court's analysis does not satisfy the strictures of *Interest of K.T.* There are two parents and five children involved in this termination case, yet the trial court's Section 2511(b) analysis with respect to Father consists of only one short paragraph. Trial Court Opinion (Father), 6/17/2022, at 28. The trial court issued a "truncat[ed]" Section 2511(b) analysis with respect to Mother as well. *See Interest of K.T.*, 296 A.3d at 1114; Trial Court Opinion (Mother), 6/17/2022, at 32. The trial court acknowledged that the children enjoy visits with their Parents and that children are bonded with their Parents. Trial Court Opinion (Father), 6/6/2022, at 28; Trial Court Opinion (Mother), 6/17/2022, at 32. Nonetheless, the court opined that termination was in the best interests of the children because they are safe with foster mother and are receiving therapy. Trial Court Opinion (Father), 6/6/2022, at 28; Trial Court Opinion (Mother), 6/17/2022, at 32. Although the court stated that the children "have exhibited troubling behaviors, which suggests trauma[,]" the trial court did not specifically connect any "troubling behaviors" to Parents, who had only been permitted to engage in supervised visits with their children throughout the course of this lengthy case. Trial Court Opinion (Father), 6/6/2022, at 28; Trial Court Opinion (Mother), 6/17/2022, at 32.[13]

The trial court did not assess **each child's** specific needs and welfare under Section 2511(b) in relation to each parent. Although the record unequivocally revealed

---

[13] Regarding "troubling behaviors," the trial court referenced testimony of the foster mother from the January 11, 2022 permanency review hearing. Trial Court Opinion (Father), 6/6/2022, at 28; Trial Court Opinion (Mother), 6/17/2022, at 32.

that Parents are bonded with their children, neither the trial court nor Superior Court "explicitly considered whether severance in this case would destroy a necessary and beneficial parental bond," *id.* at 1112, the guiding principle when a bond exists between parent and child. The trial court neglected to assess, as part of the required Section 2511(b) analysis, the extensive testimony addressing the negative and severe emotional impact that destroying the familial bonds would have on all five children. In fact, the professionals who worked closely with the family expressed well-founded concerns at the termination hearings regarding the severe emotional impact termination would have on the children. N.T., 4/1/2022, at 76-86 (revealing that B.W. did not want visits to end, became anxious with how much time was left in visits, and had suicidal ideations and anxiety related to how long it was taking him to return home with Parents); *Id.* at 97 (Parents have healthy relationships with children); *Id.* at 103-104 (it would be beneficial for Children to have ongoing contact with Parents).[14] The only testimony that contradicted these concerns was that of the CYF Caseworker, who baldly opined, based on her two visits with the children, that termination would not have a long-term impact upon children. N.T., 4/18/2022, at 238-39. This testimony alone cannot satisfy the demanding statutory requirements that we reinforced in *Interest of K.T.*

---

[14] Legal counsel for each child stated their positions. B.W.'s legal counsel implored the trial court to consider the emotional effects termination would have on the child and the fact that the child "has been very black and white about his desire to go home to his parents." N.T., 4/18/2022, at 197. Ed.A.'s counsel indicated that Ed.A. is bonded with Parents, and though he was comfortable with his foster mother and wanted Parents to have more time "to solidify their progress," he did not want parental rights to be terminated. *Id.* at 198. El.A.'s attorney stated that his client opposed termination, and counsel opined that "it would be detrimental to [his] client's overall well[-]being if the parental rights were terminated at this juncture." *Id.* at 201. R.A.'s counsel similarly testified that R.A. has a strong bond with Parents, especially Mother. *Id.* R.A.'s counsel was "very concerned as to what termination will do to her[.]" *Id.* Finally, A.A.'s counsel stated that, because the child was so young, "any effect on [A.A.] would be vicariously through the siblings and how that affects them as they grow up." *Id.* at 202.

Parents and children "share an interest in avoiding erroneous termination." *Santosky,* 455 U.S. at 765. Termination decisions are "often bound up in complex factual scenarios involving difficult family dynamics and multiple service providers." *Interest of S.K.L.R.*, 256 A.3d at 1129. To reiterate, trial courts "are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act." *Id.* A review of the trial court's termination decisions here reveals that it did not do this. It did not carefully consider and weigh all of the evidence presented at the termination hearings; instead, the trial court chose to narrowly focus on the conditions that led to removal. The trial court simply did not factor the evidence of Parents' substantial progress into the equation. As an appellate court, we must address whether the record supports the trial court's order. *See In re Adoption of C.M.*, 255 A.3d at 362; *Interest of S.K.L.R.* 256 A.3d at 1121; *Matter of Adoption of Charles E.D.M., II*, 708 A.2d at 91 (recognizing that appellate courts have an obligation to review whether competent evidence supports the trial court's termination decree). It is clear that the trial court's termination decision is not supported with clear and convincing evidence and that reversal is warranted. However, out of an abundance of caution, I would vacate the decision of the Superior Court and remand to the trial court to take into account the evidence presented at the termination hearing. If on remand, the trial court, after considering and weighing all of the evidence supported by the record, determines that termination is warranted, it must apply the appropriate analysis to satisfy the structures enunciated in *Interest of K.T.* in the Section 2511(b) analysis.

For these reasons, I believe that dismissing the appeal as improvidently granted is inappropriate. If there is a basis in the law to support the trial court's decision based on

this record, those in favor of allowing the termination of the rights of these parents to their

five children should articulate the basis in an opinion for the benefit of the bench and bar.